**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION AT DAYTON**

| | | |
|---|---|---|
| MONICA BETTS, | : | |
| | : | |
| Plaintiff, | : | Case No. 3:25-cv-122 |
| | : | |
| v. | : | Judge Thomas M. Rose |
| | : | |
| COPELAND | : | Magistrate Judge Caroline H. Gentry |
| (*formerly Emerson)*, | : | |
| | : | |
| Defendant. | : | |
| | : | |
| | : | |

---

**ENTRY AND ORDER GRANTING, IN PART, AND DENYING, IN PART,**
**DEFENDANT'S MOTION TO DISMISS (DOC. NO. 13)**

---

Presently before the Court is Defendant Copeland Corporation LLC's ("Copeland") Motion to Dismiss ("Motion") (Doc. No. 13). Following the denial of her application to proceed *in forma pauperis* (Doc. No. 5) and the payment of her initial filing fee (Doc. No. 6), Plaintiff Monica Betts ("Betts") filed her Complaint (Doc. No. 9), alleging Copeland, Betts' former employer, discriminated against her on the basis of race and retaliated against her when she complained, all in violation of Title VII of the Civil Rights Act, 42 U.S.C. § 2000e, *et seq.* ("Title VII") and Ohio state law.[1] (*See* Doc. No. 9 at PageID 54-56, 61-62.) Copeland has now responded with the instant Motion, arguing that Betts' Complaint is untimely and, in any event, fails to state a claim for either race discrimination or retaliation. (Doc. No. 13 at PageID 69.) Upon review, the Court is determined to **GRANT**, **IN PART**, and **DENY**, **IN PART**, Copeland's Motion.

---

[1] The Court notes that Betts, proceeding *pro se*, has not explicitly invoked Ohio law, but she purportedly filed a charge of discrimination with both the Equal Employment Opportunity Commission and the Ohio Civil Rights Commission. (Doc. No. 9 at PageID 61-62.) Thus, the Court liberally construes Betts' Complaint as alleging employment discrimination claims under both state and federal law.

1

## I.   BACKGROUND

As alluded to above, Betts' Complaint concerns her former employment at Copeland.[2]  (*See generally* Doc. No. 9 at PageID 48.)  Betts claims she was hired by Copeland in February 2022 as a human resources analyst.  (*Id.*)  In broad strokes, her duties in said role allegedly included providing support for Copeland's employees, facilitating the orientation of new employees, and interacting with certain third-party vendors.  (*Id.*)

Betts asserts that she began experiencing discrimination almost immediately upon her arrival at Copeland.  (*Id.*)  Betts claims that, within her first week of employment, a coworker sent her an email, copying Betts' supervisor, "that was not very nice."  (*Id.*)  Betts' supervisor allegedly instructed the coworker to reach out to Betts directly without copying him on the communications. (*Id.*)  Then, in or around August 2022, Betts allegedly saw the scope of her duties begin to shrink. (*Id.* at PageID 48-49.)  Betts states that she was initially pleased with the plan to reassign job responsibilities, as these changes were allegedly meant to "prevent anyone from being overworked."  (*Id.*)  But eventually, enough of Betts' tasks were reassigned that she felt she "was secretly being demoted."  (*Id.* at PageID 49.)

By her account, Betts' duties to support a particular business group within Copeland were handed over to a supposedly part-time human resources employee, named in the Complaint only as "Alexis."  (*Id.*)  This reassignment of duties had allegedly been discussed in Copeland's human resources department prior to occurring, but no meeting ever occurred to discuss specifics.  (*Id.* at PageID 48-49.)  Subsequently, Betts purports that Alexis was improperly promoted to a full-time position which sat higher in the office hierarchy than the role Betts held.  (*Id.* at PageID 50.)

---

[2] At the time of her employment, Copeland was allegedly subject to different ownership and went by the name "Emerson Climate Technologies."  (Doc No. 9 at PageID 48.)  For the sake of consistency, the Court refers to the Defendant as "Copeland," even when discussing time periods when the company would have been known as "Emerson."

Betts further reports feeling excluded and marginalized during her time at Copeland. (*Id.* at PageID 49-50.) To that end, she contends that she and another coworker were assigned desks that were secluded from the rest of the human resources team. (*Id.* at PageID 49.) In addition, Betts alleges that in the course of 2023, she was not invited to attend a diversity, equity, and inclusion event at Copeland until the last minute. (*Id.* at PageID 50.) On another occasion, Betts' coworkers knew about department changes before she did and Betts assumes that her colleagues were meeting without her. (*Id.* at PageID 49-50.) In separate instance, Betts claims that she was marginalized by Alexis when Alexis opted to train Betts using screen-sharing technology, rather than teaching her how to perform a task face-to-face. (*Id.* at PageID 50.) And, finally, Betts avers that she felt discriminated against when her colleagues were especially friendly. (*Id.* at PageID 51.) This ostensible pattern led Betts to feel "very uncomfortable." (*Id.* at PageID 50 ("There were a few other microagressions that took place that made me feel very uncomfortable like I do not belong, and I am not valued as an employee").)

At some point before May of 2023, Betts allegedly took her complaints to Copeland's higher-ups. (*Id.* at PageID 51.) On or around May 10, 2023, Copeland began an investigation into Betts' grievances and Betts was interviewed accordingly, along with the individuals named in her complaint. (*Id.*) At her interview, Betts apparently said that she would "leave on the first thing smoking," if her relocation agreement was not honored. (*Id.*) It is not clear how Betts' relocation pertains to her claims of discrimination. Nonetheless, before Copeland's investigation concluded, Copeland allegedly offered Betts the opportunity to resign with a severance package rather than see the investigation through. (*Id.* at PageID 51-52.) Betts declined this offer and stayed at Copeland. (*Id.* at PageID 52.) In the end, Copeland determined that Betts had not been

3

discriminated against.  (*Id.*)  In particular, Copeland supposedly informed Betts that events such as the reassignment of her duties occurred because of Betts' poor job performance.  (*Id.*)

In or around June of 2023, after Copeland's investigation into Betts' complaints concluded, Betts states that she received a poor mid-year performance review.  (*Id.*)  Betts claims that she received a rating of "unacceptable," but she doubts that she was given this rating in good faith.  (*Id.*)  In her view, this performance review did not comport with her previous evaluations, which were allegedly worthy of merit-based salary increases and other employee perks.  (*Id.*)

Betts proceeded to file a charge of discrimination against Copeland with the U.S. Equal Employment Opportunity Commission ("EEOC") and the Ohio Civil Rights Commission.  (*Id.* at PageID 61-62.)  In the charge, Betts alleged that she had been subject to racial discrimination and retaliation.  (*Id.* at PageID 61.)  To support the charge, Betts identified herself as an African-American individual and she described the circumstances surrounding Alexis's promotion.  (*Id.*)  The overarching assertion made was essentially threefold: Betts is an African-American; Alexis is a white woman who was promoted to a position more desirable than the one Betts occupied; and, Betts thought this was "just one example of the racist undertone throughout the company."  (*Id.*)  Betts purportedly continued to work for Copeland until June 2024 (*Id.* at PageID 53), but the EEOC investigated her charge of discrimination until January 8, 2025, when it notified Betts of her right to sue under Title VII.  (*Id.* at PageID 57.)

Betts brought this case on April 8, 2025, and contemporaneously applied to proceed *in forma pauperis*.  (Doc. No. 1.)  On June 26, 2025, the Court ordered Betts to file an amended application for pauper status.  (Doc. No. 3.)  By October 22, 2025, Betts had not submitted an amended *in forma pauperis* application and the Court ordered her to pay the Court's filing fee

4

within 30 days.  (Doc. No. 5.)  In compliance with this order, Betts submitted her $405 filing fee on November 21, 2025.  (Doc. No. 6.)

The Clerk of Courts then filed Betts' current Complaint on the Court's docket on November 26, 2025.  (Doc. No. 9.)  In her Complaint, Betts does not clearly title her causes of action.  Rather, she has provided the allegations summarized by this Order thus far and attached her charge of discrimination made to the EEOC and the Ohio Civil Rights Commission. Accordingly, the Court construes Betts' Complaint as alleging causes of action for race discrimination and retaliation.[3]

In response, Copeland filed its instant Motion on March 3, 2026.  (Doc. No. 13.)  After receiving a lengthy extension of time, Betts submitted her response in opposition to the Motion on May 29, 2026.  (Doc. No. 16.)  After receiving a brief extension of its own, Copeland filed its final reply in support of its Motion on June 26, 2026.  (Doc. No. 18.)  This matter is, therefore, ripe for review and decision.

## II.  <u>STANDARD OF REVIEW</u>

"The purpose of a Rule 12(b)(6) motion to dismiss is to allow a defendant to test whether, as a matter of law, the plaintiff is entitled to legal relief even if everything alleged in the complaint is true." *Bihn v. Fifth Third Mortg. Co.*, 980 F. Supp. 2d 892, 897 (S.D. Ohio 2013) (citing *Mayer v. Mylod*, 988 F.2d 635, 638 (6th Cir. 1993)).  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  A claim is facially plausible when it includes

---

[3] Betts also describes her working environment at Copeland as "toxic."  (Doc. No. 9 at PageID 53.)  However, Betts did not raise a hostile work environment claim at the administrative level.  Therefore, the Court will not construe the Complaint to allege a hostile work environment claim.  *Younis v. Pinnacle Airlines, Inc.*, 610 F.3d 359, 361 (6th Cir. 2010) ("As a general rule, a Title VII plaintiff cannot bring claims in a lawsuit that were not included in his EEOC charge") (citations omitted).

"factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*  This standard is not the same as a probability standard, but "asks for more than a sheer possibility that a defendant has acted unlawfully." *Id*.  "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Id*. (internal quotation marks omitted).  Thus, if a plaintiff has "not nudged [its] claims across the line from conceivable to plausible, [the] complaint must be dismissed." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

When ruling on a motion to dismiss, the Court must accept the factual allegations of the complaint as true and construe them in a light most favorable to the non-moving party. *Id.* at 554-55.  However, the Court is not bound to accept as true a legal conclusion couched as a factual allegation. *Id*. at 555-56.  "In evaluating a motion to dismiss [a court] may consider the complaint and any exhibits attached thereto, public records, items appearing in the record of the case and exhibits attached to the defendant's motion to dismiss so long as they are referred to in the complaint and are central to the claims contained therein." *Luis v. Zang*, 833 F.3d 619, 626 (6th Cir. 2016) (internal quotation marks omitted).

### III.  <u>ANALYSIS</u>

At the outset, the Court must address two initial matters.  First, the Court finds Copeland's contentions regarding the timeliness of Betts' Complaint to be without merit.  Copeland correctly points out that Betts' opened this action on the last possible day she could under Title VII. (Doc. No. 13 at PageID 72-73.)  To that end, Copeland further notes that Betts did not pay the Court's filing fee and effectively initiate suit until well after the time allowed by statute. (*Id.* at PageID 73-75.)  Consequently, Copeland says that Betts' Complaint is time-barred and is not otherwise eligible for equitable tolling. (*Id.* at PageID 75-76.)

As a rule, Title VII affords plaintiffs, like Betts, 90 days from the date the EEOC notifies them of their right to sue to file suit in district court.  42 U.S.C. § 2000e-5(f)(1).  When a Title VII plaintiff brings her case along with an application to proceed *in forma pauperis*, the plaintiff's complaint will not be considered filed until "[*in forma pauperis*] status is granted or the appropriate filing fee is paid, rather than at the time a complaint is delivered to the clerk of court."  *Truitt v. Cnty. of Wayne*, 148 F.3d 644, 648 (6th Cir. 1998) (citation omitted).  Effectively, Title VII's 90-day time limitation is tolled during the pendency of a plaintiff's *in forma pauperis* application.  *Id.* To be sure, "the [90-day] filing requirement of 42 U.S.C. § 2000e-5(f)(1) is **not** a jurisdictional requirement, but, instead, is a timing requirement similar to a statute of limitations, subject to waiver, estoppel, and equitable tolling."  *Id.* at 646-47 (emphasis in original).

Though Title VII's filing requirement is presumptively tolled while a plaintiff's *in forma pauperis* application is pending, district courts may equitably toll additional time between the denial of the plaintiff's application and payment of the court's filing fee, based on five factors.  *Id.* at 648.  The "five factors to consider when determining the appropriateness of equitably tolling a statute of limitations [are]: 1) lack of notice of the filing requirement; 2) lack of constructive knowledge of the filing requirement; 3) diligence in pursuing one's rights; 4) absence of prejudice to the defendant; and 5) the plaintiff's reasonableness in remaining ignorant of the particular legal requirement."  *Id.* (citation omitted).

By these standards, Betts' Complaint was not filed until her filing fee was paid on November 21, 2025, well after the 90-day filing requirement under Title VII had passed.  But, all of the factors listed in the Court's immediately preceding paragraph weigh in favor of equitably tolling Betts' time to file her present claims.  Betts certainly had notice of Title VII's 90-day filing requirement, as evinced by her filing of this case on the 90th day after receiving notice of her right

7

to sue. Yet, Betts, proceeding *pro se*, quite reasonably lacked notice that her Complaint would not be considered filed until her *in forma pauperis* application was granted or her filing fee paid. Nor can Betts be said to have had constructive notice of this principle, as it was never explained. To the contrary, when the Court denied her *in forma pauperis* application, the Court explicitly afforded Betts 30 days to pay the filing fee. *Balwin Cnty. Welcome Ctr. v. Brown*, 466 U.S. 147, 151 (1984) (citing *Carlile v. South Routt Sch. Dist. RE 3-J*, 652 F.2d 981 (10th Cir. 1981)) (acknowledging that equitable tolling may be appropriate "where the court has led the plaintiff to believe that she had done everything required of her"). Diligently pursuing her rights, Betts did just that. Finally, the Court appreciates the potential prejudices Copeland could face if Betts' time-to-file is equitably tolled, but the occurrence of such prejudices is purely speculative at this point. Copeland offers no evidence that equitable tolling here will in-fact cause it to suffer prejudice. Hence, the Court equitably tolls the filing of Betts' Complaint, finds that Betts' claims are otherwise timely-made, and **DENIES** Copeland's Motion in this regard.

Secondly, the Court clarifies the law applicable to Betts' claims on the merits. Generally, Title VII makes it unlawful for an employer "to fail or refuse to hire . . . any individual or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment" because of his race. 42 U.S.C. § 2000e-2(a)(1). Regarding state law, Ohio courts typically look to federal case law dealing with Title VII when considering claims under Ohio Rev. Code § 4112. *Plumbers & Steamfitters Joint Apprenticeship Comm. v. Ohio Civil Rights Comm'n.*, 421 N.E.2d 128, 131 (Ohio 1981). Indeed, "it is well-settled in Ohio that the standard for state law discrimination claims asserted under Section 4112 of the Ohio Revised Code is the same as the standard for federal discrimination claims asserted under Title VII and related

civil rights statutes." *Pittman v. Cuyahoga Valley Career Ctr.*, 451 F. Supp. 2d 905, 930 (N.D. Ohio 2006).

As such, the Court analyzes Betts' claims under both state and federal law pursuant to Title VII standards. The Court takes on Betts claims for race discrimination and retaliation in like succession.

### a. Race Discrimination

The Court now turns its attention to Betts' claims of race discrimination. On this front, Copeland argues that Betts has failed to plausibly allege a prima facie case of race discrimination. (Doc. No. 13 at PageID 77.) In particular, Copeland posits that the perceived slights against Betts, such as the reassignment of Betts' duties and the promotion of Alexis, do not amount to material adverse employment action giving rise to a claim of race discrimination. (*Id.* at PageID 77-78.)

A plaintiff must establish the following prima facie elements to succeed on a race discrimination claim: "(1) he is a member of a protected class, (2) he was qualified for the job and performed it satisfactorily, (3) despite his qualifications and performances, he suffered an adverse employment action, and (4) he was replaced by a person outside the protected class or was treated less favorably than a similarly situated person outside his protected class." *Wingo v. Mich. Bell Tel. Co.*, 815 F. App'x. 43, 45 (6th Cir. 2020) (citing *Wheat v. Fifth Third Bank*, 785 F.3d 230, 237 (6th Cir. 2015)).

Importantly though, these prima facie elements constitute an evidentiary standard that applies at summary judgment and trial, not at the pleading stage. *See Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 510 (2002). At the pleading stage, the plaintiff "bears the burden of alleging facts that plausibly suggest a causal connection between his protected status and the adverse employment action." *Mustafa v. Ford Motor Co.*, No. 24-1763, 2025 WL 2720988, at *4 (6th Cir.

9

Sept. 24, 2025) (citing *Keys v. Humana, Inc.*, 684 F.3d 605, 610 (6th Cir. 2012)).  The Supreme Court has stated that it "never indicated that the requirements for establishing a prima facie case … also apply to the pleading standard that plaintiffs must satisfy in order to survive a motion to dismiss." *Swierkiewicz*, 534 U.S. at 511.  The Sixth Circuit has provided that "[a]lthough dismissal on the pleadings is often inappropriate in employment discrimination cases," if the allegations are "so conclusory that no plausible claim could be inferred," then dismissal is appropriate.  *See Masaebi v. Arby's Corp.*, 852 F. App'x. 903, 909 (6th Cir. 2021).  In making such a determination, the Court shall "not accept conclusions of law or unwarranted inferences of fact cast in [the] form of factual allegations."  *Han v. Univ. of Dayton*, 541 F. App'x 622, 625 (6th Cir. 2013) (citing *Twombly*, 550 U.S. at 555).

At present, while the Court is skeptical of Copeland's argument that Betts' was not subjected to materially adverse employment action, it remains readily apparent that Betts has not alleged a plausible causal connection between the purported employment actions she faced and her race.  On the face of the Complaint Betts appears to allege that: she is not white; the vast majority of her coworkers at Copeland were white; and, therefore, any perceived adverse employment action Copeland took must have been racially motivated.  This kind of circular reasoning may comport with Betts' lived experience, but, legally, it offers no facts to draw a plausible connection between Betts' race and any potentially adverse employment action.  Even assuming that Copeland took adverse employment action against Betts when reassigning her duties and the like, Betts has made no allegation which could lead a reasonable factfinder to believe that race was the underlying cause.

At most, Betts claims that Alexis was improperly promoted to a more desirable position than the one Betts held.  But, Betts does not claim that she applied for or otherwise wanted the job

10

Alexis got.  Betts may be African-American and Alexis may be white, but if Betts was not in the running for the job to begin with, all Betts is really claiming is that she found it offensive when an unqualified white woman was promoted.  This is hardly an adverse employment action against Betts and cannot possibly state a plausible claim of race discrimination.  Accordingly, the Court **GRANTS** Copeland's Motion with respect to Betts' claims of race discrimination.

### b.  <u>Retaliation</u>

Looking now to Betts' claims of retaliation, Copeland's poses two arguments.  First, Copeland suggests that Betts receiving a bad performance review after complaining of race discrimination does not amount to a *materially* adverse action.  (Doc. No. 13 at PageID 79 (emphasis added).)  Secondarily, Copeland submits that Betts has failed to plead a causal connection between her bad performance review and her prior complaints of racial discrimination at the company.  (*Id.* at PageID 79-80.)  More specifically, Copeland argues that Betts has not attached her allegations of temporal proximity to any indicia of retaliatory motive.  (*Id.* at PageID 80.)

Like claims of race discrimination, Title VII retaliation claims also require plaintiffs to make out a prima facie case to succeed.  *See Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 523 (6th Cir. 2008).  "To establish a prima facie case of retaliation, [the plaintiff] must show '(1) that he engaged in a protected activity; (2) that the defendant had knowledge of his protected conduct; (3) that the defendant took an adverse employment action towards him; and (4) that there was a causal connection between the protected activity and the adverse employment action.'"  *Id.* (quoting *Weigel v. Baptist Hosp. of E. Tenn.*, 302 F.3d 367, 381 (6th Cir. 2002)).  Again, these elements constitute an evidentiary standard not entirely applicable at the pleading stage, *see*

*Swierkiewicz*, 534 U.S. at 510, but the Court finds the elements helpful in framing the issue, nonetheless.

Addressing Copeland's Motion, the Court first finds that Betts' bad performance review is a plausibly alleged adverse action in the context of her retaliation claims. Title VII's "antiretaliation provision extends beyond workplace-related or employment-related retaliatory acts and harm." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67 (2006). In that vein, the Supreme Court has dictated that a plaintiff claiming Title VII retaliation "must show that a reasonable employee would have found the challenged action materially adverse, 'which in this context means it might well have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Id.* (quoting *Rochan v. Gonzalez*, 438 F.3d 1211, 1217-18 (D.C. Cir. 2006)) (internal quotation marks omitted). Interpreting this rule, the Sixth Circuit has held that a lower-than-expected performance evaluation may be considered a materially adverse action if it "significantly impact[s] an employee's wages or professional advancement." *Halfacre v. Home Depot, U.S.A., Inc.*, 221 F. App'x. 424, 433 (6th Cir. 2007)).

Here, Betts has alleged enough for the Court to infer the material adversity of her bad performance review. Throughout her Complaint, Betts appears to be quite concerned with her own professional advancement. By any measure of common sense, Betts' opportunities for professional advancement could plausibly be stifled by a negative performance review. Moreover, as stated above, Betts claims all of her previous performance reviews were good enough that she qualified for merit-based salary increases. Conversely, her bad performance review would have disqualified Betts from receiving wage increases. In other words, the bad performance review that Betts received after complaining of discrimination can reasonably be inferred to negatively affect both Betts' wages and her opportunities for professional development. More to the heart of the

12

matter, a reasonable employee would be unlikely to complain or bring a claim of discrimination at Copeland if they expected these consequences to follow.  Therefore, the Court finds that Betts has plausibly alleged a materially adverse action in support of her Title VII retaliation claim.

The Court further finds that Betts has adequately pled causation in relation to her retaliation claim, by way of temporal proximity and other circumstances.  Generally, "[a]lthough no one factor is dispositive in establishing a causal connection, evidence … that the adverse action was taken shortly after the plaintiff's exercise of protected rights is relevant to causation." *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000) (citing *Moon v. Transp. Drivers, Inc.*, 836 F.2d 226, 230 (6th Cir. 1987)).  "[W[here some time elapses between when the employer learns of a protected activity and the subsequent adverse employment action, the employee must couple temporal proximity with other evidence of retaliatory conduct to establish causality." *Mickey*, 516 F.3d at 525 (citation omitted).  However, "if an employer immediately retaliates against an employee upon learning of his protected activity, the employee would be unable to couple temporal proximity with any such other evidence … and little other than the protected activity could motivate the retaliation." *Id.*

At bar, Betts' complaints of discrimination to Copeland occurred close enough in time to the poor performance evaluation she received to be suspect at the pleading stage.  True, Betts complained in May of 2023 and received her performance evaluation approximately one month later, so the former did not necessarily immediately precede the latter.  Yet, at the pleading stage, the Court construes Betts' Complaint to allege that she complained of discrimination and Copeland subsequently took adverse action against her at the first available opportunity.  Not for nothing, Copeland did issue Betts a negative performance evaluation almost immediately after offering her the opportunity to resign, in lieu of seeing the investigation into her claims through.

The Court additionally considers Betts' claim that she had received only positive performance reviews up until she made a complaint of discrimination.  Drawing all inferences in Betts' favor, this juxtaposition is likewise suspect.  The only delineating factor between Betts' supposed good evaluations and her one bad one—that the Court can draw from the Complaint— is her grievances pertaining to race discrimination.  Whether this notion will be proven true by further evidence is a matter for another day.  For now, Betts has made sufficient causal allegations for her retaliation claims.

Thus, the Court **DENIES** Copleland's Motion with respect to Betts' retaliation claims.

## IV.  CONCLUSION

Based on the Foregoing, the Court hereby **GRANTS**, **IN PART**, and **DENIES**, **IN PART**, Copeland's Motion to Dismiss (Doc. No. 13).  Specifically, the Court hereby **GRANTS** Copeland's Motion with respect to Betts' race discrimination claims and, therefore, **DISMISSES** said causes of action under state and federal law.  Copeland's Motion is hereby **DENIED** in all other respects.  This Order is **NOT DISPOSITIVE** of the entire matter and the instant case shall remain active on the Court's docket.  Copeland shall file any responsive pleading to Betts' Complaint in accordance with the Federal Rules of Civil Procedure.

**DONE** and **ORDERED** in Dayton, Ohio, this Tuesday, July 21, 2026.

s/Thomas M. Rose

_____

THOMAS M. ROSE
UNITED STATES DISTRICT JUDGE

14